[Cite as *State v. King*, 2021-Ohio-1113.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 28807 |
| | : | |
| v. | : | Trial Court Case No. 2019-CR-477 |
| | : | |
| TODD ANTHONY KING | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 2nd day of April, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR. by HEATHER N. KETTER, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MICHAEL MILLS, Atty. Reg. No. 0092133, 371 West First Street, 2nd Floor, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Todd Anthony King appeals from his conviction on charges of felonious assault (five counts), evidence tampering, inducing a panic, child endangering (two counts), having a weapon while under disability, and a firearm specification.

{¶ 2} King advances three assignments of error. First, he contends the trial court erred in finding him competent to stand trial without conducting an evidentiary hearing. Second, he alleges ineffective assistance of counsel based on his attorney's failure to request an evidentiary hearing on the issue of his competence. Third, he claims his convictions for all firearm-related offenses were against the manifest weight of the evidence.

{¶ 3} The present appeal stems from King's role in a standoff with police following a 911 call from his home reporting a domestic disturbance. During the roughly 12-hour incident, King's girlfriend, Demjanjuk Harriel, informed a 911 dispatcher that he was actively loading a handgun and wanted to engage in a shootout with police. When officers arrived at the scene, Harriel went outside and told them King was armed and intoxicated and that her two young children remained inside with him. A neighbor, Denise Russell, also spoke with officers. She indicated that she had talked to King on the phone prior to their arrival. Russell reported that King wanted to die in a "Mexican standoff" with police, that he was potentially intoxicated, and that he was armed. Over the hours that followed, King appeared in the doorway and on the porch of his home and spoke to officers but refused to leave the premises. Around 10:30 p.m., he was observed with what appeared to be a black AR-15 rifle in his hand. When King pointed it in the direction of officers outside, they fired their own weapons at him. The officers reported that King then returned

fire as evidenced by a visible muzzle flash and the sound of a gunshot from inside the home. Throughout the night King was observed near a makeshift barricade. Sometimes he was seen holding a young child. After hours of negotiations, King walked out of the home and was arrested.

{¶ 4} Outside of King's home, police found two spent nine-millimeter shell casings. They also found several .300 caliber shell casings that has been fired by SWAT team members. Inside the home, police found assorted rounds of live ammunition that included nine-millimeter bullets. Under a high chair in the living room, they found a nine-millimeter shell casing that had been fired from the same gun that had discharged the two nine-millimeter shell casings found outside. A spent nine-millimeter bullet also was removed from King's living-room wall near the front door. A firearms expert could not determine whether the bullet came from one of the nine-millimeter shell casings that had been recovered. Based on the location of the bullet strike in the wall, however, police officers would have been positioned in the direction that the shot was fired. Police found a realistic-looking black air rifle on the living room floor after the shooting. No operable firearms were found inside the home. Following King's arrest, Harriel visited him in jail and asked what he had done with the handgun she had seen. King responded that a friend had it.

{¶ 5} Based on the evidence presented, the trial court found King guilty of having a weapon while under disability. A jury found him guilty of the other offenses set forth above. After merging multiple firearm specifications, the trial court imposed an aggregate sentence of 28 years in prison. This appeal followed.

{¶ 6} In his first assignment of error, King contends the trial court erred in failing to

conduct a competency hearing after he raised the issue in a pretrial motion. King cites R.C. 2945.37(B), which provides that the trial court "shall hold a hearing" if a defendant's competence to stand trial is raised as an issue. King argues that the trial court violated this mandate by simply admitting two competency evaluations into the record and summarily finding him competent to stand trial. King asserts that the trial court was required to hold a "full" hearing and to inquire from defense counsel and expert witnesses about whether he was able to participate in his own defense.

{¶ 7} Upon review, we find King's argument to be unpersuasive. After King raised his competence as an issue before trial, he was evaluated by two experts. Both of the experts submitted written reports finding King competent to stand trial. King subsequently appeared in court with counsel. The prosecutor also was present. At that time, both parties stipulated to the admission of the two competency reports. They also stipulated that if the examiners were called to testify at a hearing the testimony would be consistent with their reports. (Tr. 17-18.) No other evidence was presented. Based on the content of the stipulated reports, the trial court declared King competent to stand trial. (*Id.* at 18.)

{¶ 8} Although no in-person witnesses testified in this case, the evidence at a competency hearing may consist of one or more stipulated written evaluation reports. *See* R.C. 2945.37(E) (recognizing that "[a] written report of the evaluation of the defendant may be admitted into evidence at the hearing by stipulation"). Here King effectively waived a "full" hearing with in-person witnesses by stipulating to the contents of the evaluation report and by stipulating that the examiners would testify consistent with their reports if called as witnesses. *State v. Allen,* 1st Dist. Hamilton No. C-190053, 2020-Ohio-4444, ¶17 ("R.C. 2945.37(E) provides for submitting the competency report as evidence by

stipulation. A defendant may waive his right to a competency hearing by stipulating to the competency report."); *State v. O'Neill*, 7th Dist. Mahoning No. 03 MA 188, 2004-Ohio-6805, ¶ 21 ("Where the parties stipulate to the contents of the competency reports which opine that the defendant is competent, the parties stipulate to competency and waive the competency hearing."); *see also In re A.D.*, 2d Dist. Montgomery No. 21850, 2008-Ohio-750, ¶ 20 (reasoning that a juvenile court could dispense with a competency hearing where the defendant stipulated to the contents of an expert report finding him competent to stand trial).

{¶ 9} Here the parties stipulated to the contents of two evaluation reports finding King competent to stand trial in lieu of proceeding with a fuller hearing at which the examiners would be called as witnesses. Under these circumstances, King effectively waived his right to demand anything more. Accordingly, the first assignment of error is overruled.

{¶ 10} In his second assignment of error, King alleges ineffective assistance of counsel based on his attorney's failure to request an evidentiary hearing concerning his competence to stand trial. King cites four facts that he claims were indicative of incompetence: (1) his use of a child as a "shield" during the standoff, (2) his initial refusal to undergo a competency evaluation or to appear in court with counsel, (3) his initial failure to complete two competency evaluations, and (4) his rejection of a favorable plea bargain. Although two experts ultimately evaluated King and found him competent to stand trial, he argues that his attorney should have requested a "full" evidentiary hearing on the issue. King also suggests in passing that his attorney should not have abandoned a defense that he was not guilty by reason of insanity ("NGRI").

{¶ 11} As noted above, two experts evaluated King before trial regarding his competence. Both evaluations resulted in findings that he was fully capable of understanding the proceedings and assisting counsel with his defense. In light of these findings, defense counsel reasonably elected to stipulate to the reports and to the fact that the experts would testify consistent with those reports if called to testify at a hearing. We see no deficient performance in defense counsel's failure to require the trial court to hold a "full" hearing so the two experts could testify in person. On this record, we also see no prejudice to King resulting from a lack of in-person testimony. If the experts had testified, their testimony presumably would have been consistent with their reports, just as defense counsel stipulated. We are unaware of any other evidence or testimony that reasonably might have controverted the experts' opinions and resulted in the trial court's finding King incompetent to stand trial. The four facts King cites fail to persuade us that his attorney provided prejudicially deficient representation by failing to demand a hearing with in-person testimony.

{¶ 12} Finally, defense counsel did not provide ineffective assistance by abandoning an NGRI defense. In addition to being examined for competence to stand trial, King also was examined for a potential NGRI defense. The examiner found that he did not suffer from a severe mental disease or defect at the time of his offenses and that he understood the wrongfulness of his actions. Considering that a psychological expert already had found that King did not qualify for an NGRI defense, his attorney reasonably could have decided not to pursue the defense. *State v. Pepper*, 2d Dist. Miami No. 2013-CA-6, 2014-Ohio-3841, ¶ 8 (where expert reports prepared by a psychologist unequivocally found that the defendant was competent to stand trial and sane at the time

of the offense, and the defendant did not identify any particular basis on which to challenge those reports, there was no basis to conclude defense counsel provided ineffective assistance by failing to pursue an NGRI plea). Based on the record before us, we see no reasonable probability that such a defense would have prevailed at trial. The second assignment of error is overruled.

{¶ 13} In his third assignment of error, King contends the manifest weight of the evidence did not support his conviction on any firearm-related offenses. King notes that no actual firearm was found at the scene. He claims it was implausible to believe he got rid of a firearm or hid one in the house, given that police surrounded the premises during the standoff and searched it afterward. King also asserts that the State presented conflicting testimony about the type of firearm he used or possessed, i.e., a handgun or a rifle. Finally, King questions whether the evidence supported a finding that he fired a weapon from the house toward officers. Under these circumstances, King argues that the jury lost its way in convicting him on any firearm-related charges.

{¶ 14} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 15} With the foregoing standards in mind, we conclude that King's firearm-related convictions were not against the manifest weight of the evidence. Although the weapon King used was not recovered, the record supports a finding that he discharged a handgun toward officers during the standoff. Harriel testified that prior to the 911 call, King had threatened her by holding a pistol to her head. Then during the initial 911 call, Harriel reported that King was in possession of a gun and was actively loading it. Harriel identified the weapon as a pistol, not an air rifle. Harriel's neighbor also reported that she had spoken to King, and he told her he had a gun and wanted to engage in a "Mexican standoff," which Harriel explained meant a shootout. Although officers later observed King holding what turned out to be an air rifle, they also saw a muzzle flash and the sound of a gunshot coming from inside the house. The State's evidence at trial established that an air gun does not produce a muzzle flash because it lacks gunpowder. Nor was the sound of a gunshot consistent with an air rifle being discharged. Thus, the jury reasonably could have inferred that the observed muzzle flash was coming from an actual firearm, namely the handgun that Harriel had seen King loading.

{¶ 16} The State also presented evidence of spent nine-millimeter shell casings being found, including one found in King's living room. Live nine-millimeter bullets were also found in King's house, along with ammunition of other calibers that was strewn around the residence. Harriel testified that there were no bullet holes inside her house when she exited. After King was arrested, however, officers found multiple bullet holes inside the house near the front door. One of them was accompanied by debris that was blow outward, indicating that a firearm had been fired inside the residence toward outside. A nine-millimeter shell casing was located in the house near that bullet hole. The bullet

from that gunshot was recovered from the wall and was found to have been fired from a nine-millimeter handgun, not any of the firearms used by the officers. Based on the location of that bullet, five officers outside would have been positioned in the line of fire.

{¶ 17} We note too that King remained inside the home for several hours after the gunfire. His home had a full-sized utility basement that was waist-high with miscellaneous items and had standing water on the floor. Thus, King had sufficient time to conceal a handgun and a potential place to hide it. During a jailhouse visit after King's arrest, he informed Harriel that police had failed to find a gun inside the residence. Harriel then asked King what he did with it. He responded that "Chuck got it." This response fairly supports an inference that King did have a firearm and that he hid the weapon before getting rid of it.

{¶ 18} Ultimately, it was for the trier of fact to decide whether to believe Harriel's testimony about King's loading a handgun and holding it to her head and the officers' testimony about observing a muzzle flash and hearing a gunshot inside the house. The jury also was free to find persuasive the circumstantial evidence that King discharged a firearm toward the officers and then hid the weapon before being arrested. Based on our review of the record, we do not find that the jury clearly lost its way in accepting the State's theory of the case and finding King guilty of the firearm-related offenses. The evidence did not weigh heavily against his convictions. Accordingly, the third assignment of error is overruled.

{¶ 19} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . .

TUCKER, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Heather N. Ketter
Michael Mills
Hon. Dennis J. Adkins